Dick E. STEARNS and The D. E. Stearns Company, a Partnership Composed of Dick E. Stearns and Ellen Belson Stearns, Appellants,

v.

TINKER & RASOR, a Corporation, John P. Rasor and Leo H. Tinker, Appellees.

TINKER & RASOR, a Corporation, John P. Rasor and Leo H. Tinker, Appellants,

v.

Dick E. STEARNS and The D. E. Stearns Company, a Partnership Composed of Dick E. Stearns and Ellen Belson Stearns, Appellees.

No. 15111.

United States Court of Appeals Ninth Circuit.

Dec. 27, 1957.

Rehearing Denied Feb. 25, 1958.

H. Calvin White, William P. Green, Los Angeles, Cal., Browning, Simms & Hyer, Ralph R. Browning, James B. Simms, Houston, Tex., for appellants.

Edward B. Gregg, Henry G. Hardy, San Francisco, Cal., John H. Saunders, Los Angeles, Cal., for appellee.

Before STEPHENS, Chief Judge, BARNES, Circuit Judge, and CHASE A. CLARK, District Judge.

STEPHENS, Chief Judge.

This cause is here on appeal for the second time. The original action was brought by Dick E. Stearns and The D. E. Stearns Company (hereinafter referred to as Stearns) against Tinker & Rasor, a corporation, and John P. Rasor and Leo H. Tinker (hereinafter referred to as Tinker & Rasor), seeking a judgment for patent infringement with respect to Claims 1 and 7 of United States Letters Patent No. 2,332,182. Tinker & Rasor answered, asserting defenses of invalidity, non-infringement and misuse. Tinker & Rasor also filed a counterclaim in which they sought declaratory relief of non-infringement and invalidity of the patent claims and a judgment against Stearns for unfair competition in asserting its patent and for misusing its patent.

Following trial, the District Court dismissed the complaint on the ground that Claims 1 and 7 of the Stearns patent were invalid as not constituting invention over the prior art. No findings were made as to other issues raised by the pleadings.[1] Upon appeal this Court reversed, holding that the Stearns patent is not invalid for want of invention and remanded the cause for further proceedings. Stearns v. Tinker & Rasor, 9 Cir., 1955, 220 F.2d 49, certiorari denied 350 U.S. 830, 76 S.Ct. 62, 100 L.Ed. 741.

Pursuant to this Court's mandate, oral argument was had in the District Court, and judgment was thereupon entered against Stearns, dismissing the complaint and sustaining Tinker & Rasor's counterclaim. It was also held that the manufacture by individual defendants, Leo Tinker and John Rasor, of four detectors, prior to incorporation, was an infringement of Stearns' patent, had the claims of the patent been valid. The judgment was subsequently modified to allow Stearns costs upon the first appeal pursuant to our mandate and dismissing the counterclaim as no damage was shown to Tinker & Rasor. Both parties appeal from that judgment.

The Appeal

The Stearns patent is for an "Insulation Testing Device," commonly called a "holiday detector," which is used to detect flaws or "holidays" in insulating coatings, such as coal tar or asphalt enamel, applied to steel pipelines prior to their placement in the ground. The holiday detector uses the insulating quality of the coating to inspect the pipe electrically for leaks. The detector generates a high voltage with a means for impressing this voltage across the coating between the pipeline itself, which serves as one electrode, and a traveling or exploring electrode. The exploring electrode is a part of the instrument and is moved along the length of the pipeline. If a "holiday" or flaw is encountered, current flows through the "holiday" or flaw between the pipe and exploring electrode, causing the operation of a signaling system of the instrument, thereby indicating the location of the flaw. For further explanation as to the operation and needs of such a detector, see our earlier opinion, Stearns v. Tinker & Rasor, supra [220 F.2d 53].

Claim 1 of the Stearns Patent reads as follows:

"1. An electrical exploring device for detecting defects in an insulating coating on an elongated member which comprises an exploring electrode in the form of a coiled spring adapted to extend about such member and having its ends secured together to completely embrace such member, *and means rotatably engaging and forming a movable electrical contact with said spring* at a position remote from the surface of said member for connecting said spring to a high voltage testing circuit *and for rolling said spring along such elongated member.*" (Emphasis supplied.)

The dispute as to Claim 1 centers around the meaning of the phrase "and means rotatably engaging." Tinker & Rasor argue that this phrase limits the

1. Stearns v. Tinker & Rasor, D.C., 108 F.Supp. 237.

claim to rollers or wheels, and since their detector uses a sleeve bearing, they are not infringing the Stearns patent. The District Court held that Tinker & Rasor's detector is not embraced by the Stearns patent because:

(a) Pushers without wheels or rollers are disclaimed on the face of the Stearns patent;

(b) The Stearns patent on its face contemplates no alternative to a wheeled pusher;

(c) By amending Claim 1 to recite a wheeled pusher, Stearns disclaimed and abandoned all other structures as set forth in Claim 1.

We initially note that this Court previously held that the invention of the Stearns patent is that

"the spring electrode for the first time in its use in holiday detectors is rolled, instead of being dragged. In the Stearns detector, the pusher rotably engages and forms a movable electrical contact with the spring electrode so as to roll it and connect it electrically to the high voltage test circuit; and movement of the carriage longitudinally upon the pipe imparts a rolling movement to the spring electrode. And this different coaction of the elements produces a new and useful result, viz.: The detection of holidays in a more facile and efficient way. * * *" [220 F.2d 49.]

We now advert to the reasons given by the District Court.

### File Wrapper Estoppel

In D & H Electric Company v. M. Stephens Mfg., Inc., 9 Cir., 1956, 233 F.2d 879, 882, 883, this Court recently said:

"Claims of a patent must be interpreted with reference to the history contained on the file wrapper, which is nothing more than a written record of the preliminary negotiations between the applicant and the Patent Office for a patent monopoly contract.

\* \* \* \* \* \*

"Having asserted the novelty of the right angle principle in order to secure the patent, appellant cannot now expand his coverage to include other claims which were denied him in the proceedings before the Patent Office. This is simply the exercise of the doctrine of 'file wrapper estoppel'—the gravamen of which is that an applicant who acquiesces in the rejection of his claim, and accordingly modifies it to secure its allowance, will not subsequently be allowed to expand his claim by interpretation to include the principles originally rejected or their equivalents." See also Exhibit Supply Co. v. Ace Patents Corp., 315 U. S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736, 744; Holliday v. Long Manufacturing Co., D.C., 146 F.Supp. 527; cf. Hunt Tool Company v. Lawrence, 5 Cir., 1957, 242 F.2d 347.

In the instant case the original Stearn's application tendered for the patent in suit contained fifteen claims. All but Claims 5, 6, 7, 14 and 15 were rejected. Claim 3 of the original application subsequently became Claim 1 of the amended application, original Claims 1 and 2 having been cancelled. Claim 3 as originally worded stated:

"An electrical exploring device for detecting defects in an insulating coating on an elongated member which comprises an exploring electrode in the form of a coiled spring adapted to extend about such member and having its ends secured together to completely embrace such member, and means forming a movable electrical contact with said spring at a position remote from the surface of said member for connecting said spring to a high voltage testing circuit."

The Examiner rejected this claim stating:

"Claim 3 is rejected as unpatentable over Clarvoe in view of Dye and

Bensett or Lenz. It does not amount to invention to substitute the contact means of Dye and Bensett in the apparatus of Clarvoe in view of the use of a coiled spring contact in Dye.

"Claims 1–4 are rejected as indefinite and incomplete. The statement that the rollers are 'adapted to engage' the spring in claim 4 and similar statements in claims 1–3 do not set forth a definite *operating relationship* between the parts." (Emphasis supplied.)

Reapplication was made by Stearns. Claim 3 became Claim 1. Old Claim 3 was amended to add, *after* the words "and means," the words "rotatably engaging and;" and after the word "circuit," the words "and for rolling said spring along such elongated member." Significantly, the attorney for Stearns, in his letter of resubmission, stated:

"Claims 1 and 2 have been cancelled. Claim 3 has been amended to specify that the means forming the movable electrical contact with the spring rotatably engages the spring and rolls the spring along the elongated member which is being tested. It is pointed out that in neither of the patents to Lenz, Dye or Bensett is the coiled member capable of rotation along the member which is to be tested and in no case is it mounted so that it could be rotated or rolled along such member. *In each case the means which engages the coil member would hold it against any substantial rotation.* It is, therefore, respectfully submitted that claim 3 should be allowed over the patent to Clarvoe taken with the three patents above referred to.

"It is also believed that the amendment to Claim 3 which specifies that the means forming a mov-

able electrical contact with the spring *rotatably engages the spring* obviates the Examiner's criticism of this claim as indefinite and incomplete, and that the amendment to claim 4 obviates the same criticism as to that claim." (Emphasis supplied.)

■ We hold the finding of the District Court that file wrapper estoppel in itself limited the Stearns patent to the use of a pusher with wheels or rollers to be error.[2] The Examiner stated that the claim did not set forth a definite "operating relationship" between the pusher means and the spring electrode. He did not say that he was interested in further information as to the "means." Stearns' attorney likewise, in the resubmission letter, stated that the change in language was made in order to show that the "means which engages the coil member" allows *the coil member to rotate* (not the "means" to rotate) instead of being held against substantial rotation as in the prior patents. The net effect of the amendment was to clearly state that the means forming the electrical contact *rotatably engages the spring,* and causes *the spring to rotate* and therefore *roll* along the pipe. The construction placed on the amendatory language by the District Court in effect changes the language to read that "rotatably" modifies "means," whereas as written, and as explained in the resubmission letter, the word "rotatably" modifies "engaging."

In order to substantiate its interpretation of the amendatory language, the District Court in Findings Nos. 29 to 32 set forth *portions of* the testimony of Dick E. Stearns. We take particular note of Findings Nos. 29 and 30, where, in essence, it is said that, although Dick E. Stearns experimented with a pusher without wheels or rollers, he considered

---

2. We note that the District Court in Finding of Fact No. 35(c) states that Stearns amended Claim 1 to recite a wheeled pusher. This is clearly error. The language "and means rotatably engaging" is not a proper basis for mak-

ing such a dogmatic statement that the Claim was amended to "recite a wheeled pusher." Such a statement made by the District Court is a conclusion of Law which is clearly reviewable here.

the pusher "to be unsatisfactory because in going from forward to backward motion, he believed it would break contact with the spring and such breaking of contact would cause a spark to occur and would give a false indication of a holiday." We have found added statements made by Stearns immediately after the above statement was made in which he said that if the device (pusher without wheels) was used, not as an integral part of the detector but as a separate pusher (as used in Tinker & Rasor's detector), there would "probably be enough misalignment on the pusher so that where the body furnishes articulating means of connecting to it, that it wouldn't break [the electrical contact]." We have made an exhaustive search of the record and can come to no other conclusion than that the isolated statements made by Dick E. Stearns is not sufficient to enable the trial court to overrule explicit language of the claim and language used by the Examiner and the attorney for Stearns. The reading of the testimony convinces us that Stearns did not use a wheelless pusher, because one with rollers or wheels provided a better mode of operation. This does not mean that merely because another uses a less efficient mode of operation he avoids the charge of infringement.

### Disclaimer

The District Court in Finding No. 35 (a) said that pushers or "means" without wheels or rollers are disclaimed on the face of the Stearns patent.

This finding was based on the drawings and specifications of the Stearns patent. Claim 1, as we have heretofore said, does not call for rollers or wheels on the "pusher" or "means." Claim 2 calls for "a plurality of electrically conductive *rollers* in engagement with opposite side portions of said spring [for providing electrical contact with said spring] and for causing it to roll along said member." (Emphasis supplied.) Likewise, claims 3, 4, 5, 6 and 8 recite the use of "rollers."

The patent drawings show only what Stearns calls the preferred pusher, with wheels. However, the specification or description states in part:

"Another object is to provide a novel means for moving such electrode along the pipe.

"Other objects and advantages of this invention will become apparent from the following description taken in connection with the accompanying drawings, wherein are set forth *by way of illustration and example certain embodiments* of this invention." (Emphasis supplied.)

The District Court in Findings of Fact Nos. 24, 25 and 26 stated that both in Figure 10 and Figure 15 of the drawings (which we attach to this opinion, post, p. 607), wheels or rollers were shown, and based on the language used in the specification describing the drawings, it was clear that the pusher means "rotably engaging" the electrode must have wheels or rollers. The trial court placed great emphasis on language used in the specifications in regard to the pusher shown in Figure 15. We cite in the margin the paragraph relied upon by the trial judge with the language of the trial court's finding of fact in boldface type.[3]

---

3. "It has been found that under many circumstances, the use of wheels 46 and 47 is unnecessary and under such circumstances these are omitted as shown in Fig 15. In this figure, the brackets 66 and 67, which correspond to the brackets 38 and 39, are not provided with a means for mounting wheels such as 46 and 47. They are provided, however, with mountings for wheels 68 and 69, corresponding to the wheels 44 and 45, which wheels are adapted to engage on opposite sides of the electrode 56 and provide electrical contact therewith, as well as to move said electrode along the pipe. When the wheels 46 and 47 are employed, it will be seen that they tend to rotate the wheels 44 and 45 and that rotation of these wheels is transmitted by friction to the electrode 56 tending to rotate the same as well as to push it forward. Where the wheels 46 and 47 are not employed, as in Fig. 15, the knurling 55 may be omitted so that the wheels 68 and 69

■ It is axiomatic that only a claim of a patent can be infringed. The claims of a patent measure the scope of a patent monopoly. The claims may be explained and illustrated by the description. Continental Paper Bag Company v. Eastern Paper Bag Company, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122. But a description does not necessarily limit the claims. Snow v. Lake Shore, etc., Railway Co., 121 U.S. 617, 7 S.Ct. 1343, 30 L.Ed. 1004, cited by Tinker & Rasor, is a case where a claim was limited by a description of the device, with reference to drawings. In that case there was nothing in the context to indicate that the patentee contemplated any alternative for the arrangement of the parts of the device. In Continental Paper Bag Company v. Eastern Paper Bag Company, supra, it was held that the description did not limit the claims, distinguishing Snow v. Lake Shore etc. Railway Co., supra. It was also pointed out in the Continental Paper Bag case that [210 U.S. 405, 28 S.Ct. 752]: "The claim is not for a function, but for mechanical means to bring into working relation the folding plate and the cylinder. This relation is the very essence of the invention, and marks the advance upon the prior art." In the instant case, Claim 1 is for a device to connect an electrical circuit to the coiled spring at the same time allowing the coiled spring to rotate. Prior art provided for the electrical contact with the electrode or coiled spring, but the Stearns device for the first time allowed the spring electrode to roll along the pipe rather than being dragged. Stearns v. Tinker & Rasor, supra.

In Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 97 F.2d 945, 946, it is stated:

"It is contended that there is lack of infringement for the reason that the patent is limited to a structure in which the teeth on one cone have an interfitting relation with those on the other, while in the accused assembly the cones are spaced apart in such manner that the teeth do not interfit. The claims do not provide that the teeth shall interfit. Claims 2 and 3 provide that they shall be adapted to interfit, and claims 3 and 4 are silent in respect of the matter. The specifications described the invention with particular reference to the interfitting feature of an earlier patent issued to Scott, and the diagrammatical drawing discloses interfitting teeth. But it is not essential that all of the embodiments of a patent be described. It is enough if the invention be described together with that mode which is conceived to be the best for putting it into practical use; and where that has been done, the patent is not confined to the precise mode outlined. [Cases cited.]

"Neither is it necessary that every embodiment be illustrated by the drawings unless the form of the device is the principle of the invention. Where the particular form is not an embodiment of the principle of the asserted invention, the patent is not restricted to the exact form of construction shown in the diagrammatical drawing. And a device infringes if it embodies the essential principles taught by the patent, even though there is a departure from the drawings to the extent of simple changes which would be readily conceived and made by a mechanic in the course of constructing a device on the patent." [Cases cited.] See also Cameron Iron Works v. Stekoll, 5 Cir., 1957, 242 F.2d 17.

■ We think the above quotation is particularly applicable to the instant case. The invention of the Stearns patent is not solely the "means" used to "push" or "roll" the coiled spring electrode. Rather the novelty of the Stearns

might be perfectly smooth if desired. *Wheels 68 and 69 must rotate easily to* *cause proper propulsion of the electrode while permitting it to rotate."*

invention is that the spring electrode is caused to roll along the member to be tested, while maintaining electrical contact with the high voltage test circuit. Here Claim 1 did not call for wheels or rollers while other claims did. Other claims should not be read into Claim 1. Cameron Iron Works v. Stekoll, 5 Cir., 1957, 242 F.2d 17. Kennedy v. Trimble Nurseryland Furniture, 2 Cir., 99 F.2d 786, 788. Figure 15, relied on by the District Court, did not state that wheels 68 and 69 had to be used. We read the specification as showing the preferred embodiment of the invention and that *if* wheels 68 and 69 are used, then they must be free to rotate. The patent also stated that the descriptions and accompanying drawings were "certain embodiments of this invention," which were by way of illustration and example.

We hold that the Stearns patent does not disclaim on its face the use of any other type of "pusher" or "means" to rotate the electrode other than a pusher having rollers or wheels. It is likewise not true that the patent does not contemplate the use of a pusher or means without wheels or rollers.

We additionally hold that our construction of Claim 1 does not render it invalid for indefiniteness or for failure to distinctly point out or claim the invention. Continental Paper Bag Company v. Eastern Paper Bag Company, supra, 210 U.S. at pages 421, 422, 28 S.Ct. 748. See also the recent case of Georgia-Pacific Plywood Co. v. United States Plywood Corp., D.C., 148 F.Supp. 846, 865.

In a combination claim the courts have previously condemned the practice of defining an element relied on to give novelty to the combination as a "means" plus a functional statement of what was to be accomplished by the means. In the instant case the original application to the Patent Office stated that there was "means forming a movable electrical contact with said spring." This was amended to read "means *rotatably engaging and* forming a movable electrical contact with said spring." (Emphasis supplied.) The attorney for Stearns, in his resubmission letter, specifically stated that the words were added to "obviate(s) the Examiner's criticism of this claim as indefinite and incomplete. * * *"

We are of the opinion that the amendment made by Stearns to his original application went a long way toward removing any charge of functional claiming. But we need not decide how far.

The Patent Act of 1952[4] made certain changes as to functionality. The third paragraph of Section 112 provides:

"An element in a claim for a combination may be expressed as a *means or a step for performing a specified function* without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification *and equivalents thereof.*" (Emphasis supplied.)

Several recent cases[5] and writers[6] have construed Section 112. We construe the section to mean that while an *element* in a *claim* for a combination may be expressed as a means or step for performing a function without recital of structure, material or acts in support thereof; the structure, material or acts

4. 35 U.S.C.A. § 1 et seq.

5. Application of Arbeit, 206 F.2d 947, 41 C.C.P.A.,Patents, 719; Sola Electric Co. v. General Electric Company, D.C., 146 F.Supp. 625.

6. Schramm, "The Relationship of the Patent Act of 1952 to the Anti-trust Laws," 23 George Washington Law Review, 37, 47; Wachsner, "Functional Claims," 37 Journal of the Patent Office Society 753; Risenfeld, "The New American Patent Act in the Light of Comparative Law, Part II," 37 Journal of the Patent Office Society 700, 711. Compare language found in Commentary on the New Patent Act by P. J. Federico, 35 U.S.C.A. pp. 25, 26. See also 38 Journal of the Patent Office Society p. 366.

must be described in the *specification*, and if so described, the claim will be construed to cover that which is described *and the equivalents thereof*. But the structure need not as well be recited in the claim. The question then becomes whether the rollers or wheels shown in the specification (as Stearns' best mode of carrying out its invention as required and *permitted* by the first paragraph of Section 112) are equivalent to the sleeve bearing on the pusher-contactor of Tinker & Rasor's detector. The District Court, in its comments before the case was submitted, stated:

> "The only difference here is the connector. They do substantially the same work. They produce substantially the same result, they get substantially the same results. But the claim is made that if they don't use the rollers, if they use something else beside rollers, they are not infringing.

> \* \* \* \* \* \*

> "Well, your real invention then is the fact that you have worked out a procedure by which you get the electrode to roll.

> \* \* \* \* \* \*

> "Well, the defendant [Tinker & Rasor] does the same thing, except they do it a little bit differently."

The District Court did not make a finding of equivalency because of its heretofore erroneous holdings that file wrapper estoppel prevented the application of the doctrine of equivalents, that the patent disclaimed pushers without wheels, and that the patent did not contemplate an alternative to a wheeled pusher. We hold that the wheels or rollers employed in Stearns' detectors are equivalent to the sleeve bearing used in Tinker & Rasor's device. Both rotatably engage the spring electrode so as to roll it along the pipe while maintaining electrical contact between the spring electrode and the high voltage unit. Claim 1 is not invalid for failure to particularly point out and distinctly claim the invention.

We therefore hold that Claim 1 of the Stearns patent is infringed by the device of Tinker & Rasor. Tinker & Rasor and the District Court admit infringement if Claim 1 is not limited to a pusher or "means" having rollers or wheels.

### Claim 7

Claim 7 reads as follows:

> "7. In a device of the character described, a carriage comprising a platform on wheels, an exploring electrode in the form of a flexible elongated member of circular cross section and of an electrically conductive material adapted to embrace such member adjacent said carriage, and an electrode pusher and contactor carried by and electrically insulated from said platform and having parts in electrical and mechanical contact with said electrode whereby movement of said carriage longitudinally along a member to be tested will cause a rolling movement of said electrode along such member."

Claim 7 is directed to the elements of Claim 1 plus a platform or carriage on wheels to which the pusher-contactor is attached; the net result being that when the carriage is moved longitudinally upon the pipe, such movement imparts a rolling motion to the spring electrode. Stearns' detector and Tinker & Rasor's detector differ, as to Claim 7, only in that the former's detector has the electrode pusher-contactor firmly attached (although removable) to the carriage unit, while the latter's detector has a flexible cord connection between the carriage unit and the electrode pusher-contactor. Tinker & Rasor's device requires the use of two hands. (See attached drawing of device, post, p. 607.) One hand is used to push the carriage and the other is used to hold a wand which is connected by a flexible cord to the carriage unit. The semi-sleeve bearing on the end of the wand is manually placed over the spring electrode, and when the wand is pressed forward longi-

tudinally, it imparts a rolling movement to the spring electrode.

Tinker & Rasor argue that Claim 7 is limited to a rigid connection between the carriage and spring electrode, whereas Stearns argues that since the same result is achieved in substantially the same manner, it makes no difference that a rigid connection is not used in the device of Tinker & Rasor. The District Court held in Finding of Fact No. 39 [7] that the language of Claim 7 requires that the elements be united mechanically so that movement of the carriage will cause a rolling movement to the spring electrode. In Finding of Fact No. 40, the District Court held that Claim 7 requires that the pusher arm be a solid, rigid, immovable structure mechanically carried by and moving with the carriage.

The issue resolves itself into the question whether the pusher-contactor can be *connected by* any means to the platform or carriage. We first note that the language of the claim states that the electrode pusher-contactor is *carried by* the platform. We also note that Figures 1 and 10 (to be found at the end of this opinion, post, p. 607) of the Stearns patent show a rigid connection between the carriage and the pusher-contactor, and thus the pusher-contactor will be *carried by* the carriage. Likewise, it was not novel in the Stearns patent when the carriage was placed atop the pipe on a platform with wheels which allowed it to be pushed or pulled along the top of the pipe. Stearns v. Tinker & Rasor, supra, 220 F.2d at page 52.

Stearns relies on the doctrine of equivalents and argues that the substitution of a flexible connection of the pusher with the carriage does not change the basic mode of operation or the results obtained.

In Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097, it is said:

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage —the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of the law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

"The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. * * * The theory on which it is founded is that 'if two

---

7. The District Court signed 60 Findings of Fact and 10 Conclusions of Law. Although labeled as Findings of Fact, it is apparent that a majority of such Find- ings are not pure Findings of Fact, but rather are mixed Findings of Fact and Conclusions of Law.

devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.'

\* \* \* \* \* \*

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with the one that was." See also Swanson, "A Discussion of the Application of the Doctrine of Equivalents in the Graver Tank & Mfg. Co. v. Linde Air Products case," 33 Journal of the Patent Office Society 19.

Stearns admits that the translation of the longitudinal movement of the carriage and pusher to the rolling movement of the electrode is the novel concept of Claim 7. As we have heretofore said, the claim calls for the electrode pusher-contactor to be "carried by" the carriage platform. In Tinker & Rasor's device it is not. We affirm the holding of the trial court that the structure of Claim 7 is not copied by Tinker & Rasor. "The context of the patent, the prior art, and the particular circumstances of the case" convince us that the two devices do not do the same work in substantially the same way to accomplish substantially the same result. Tinker & Rasor's device is merely an inferior device which does not encompass the particular novel feature of the Stearns detector, in that in Tinker & Rasor's device, longitudinal movement of the carriage does not cause a rolling movement of the spring electrode as is done in the Stearns detector. The particular and unusual feature of Stearns' Claim 7 is lacking in Tinker & Rasor's detector. The doctrine of equivalency cannot be stretched far enough to encompass the device of Tinker & Rasor.

## Misuse

The District Court held that Stearns was not entitled to relief for infringement because it had misused its patent by employing it to monopolize and to restrain competition in unpatented materials, that is, by its leasing policy and by its licensing policy, and refusal to sell the patented item separate from unpatented machines.

The doctrine of patent misuse is today one of the most important and unsettled aspects of patent law. This has been brought about by inconsistent decisional law and statutory enactment. The doctrine of patent misuse is similar to the common law equity doctrine of "unclean hands" and in effect prevents a patentee from enforcing his patent monopoly, because, as alleged in our case, he has sought to gain by requiring the leasing, licensing or sale of the patented item in conjunction with patented articles.

The doctrine of patent misuse is closely related to the doctrine of contributory infringement. In order to understand one it is necessary to understand the other. This is because of the fact that misuse is predicated upon a finding that the patentee has done acts which have their purpose of expanding the scope of his patent monopoly; while contributory infringement, because of its very nature, in practical effect allows

a certain expansion of a patent monopoly in order to protect the patentee from a denial of his lawful rights of monopoly over his invention. Contributory infringement is akin to the tort doctrine of joint tortfeasors. Contributory infringement was developed as a practical means of enabling the patentee to secure protection against those who were not direct infringers of his patent. The scope of the doctrine has undergone expansions and contractions. The latest Supreme Court determination of its scope is a contraction. As a result of the decision in Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 272, 88 L.Ed. 376, it was expressed as doubtful whether the doctrine was still alive. In Mercoid Justice Douglas upheld the defense of misuse even though the unpatented article therein involved was "an integral part of the structure embodying the patent" and may have been the "heart of the invention" or the "advance in the [prior] art." Cases [8] prior to Mercoid mainly involved unpatented supplies or articles or articles consumed in a patented machine or process. The primary significance of the Mercoid case is the fact that the unpatented article therein involved was a non-staple article apparently usable only in the combination patent. It was thus seen by many that the very heart of the doctrine of contributory infringement had been removed, since contributory infringement had been more or less limited to a situation wherein the alleged contributory infringer was dealing with a non-staple article which was an integral part of the combination and had no other substantial use. It was immediately realized that if, for example, a manufacturer holding a combination patent attempted to bring an action against a contributory infringer it might be held that he had "unclean hands" and could not maintain the action even though it was proved that, or admitted that, the defendant was making or dealing in an essential and non-staple component of the invention and in effect was depriving the patentee of his inherent monopoly right in his patent. The manufacturer-plaintiff would have "unclean hands" merely because his bringing suit was an attempt to extend the scope of his patent monopoly "contrary to the public interest."

Principally because of the Mercoid case, Section 271 of the 1952 Patent Act [9] was adopted. That section provides:

"271. Infringement of patent

"(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

"(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

"(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

"(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his

8. Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871; Carbice Corp. v. American Patents Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367.

9. 35 U.S.C.A. § 1 et seq.

having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement. July 19, 1952, c. 950, § 1, 66 Stat. 811."

 It is clear that by virtue of Section 271 a patentee who sells, leases or licenses a complete combination can bring an action against a contributory infringer (as defined in the statute) and such bringing of suit is not in itself a misuse of the patent monopoly. Section 271(d) (3) authorizes a patentee to enforce his patent right against contributory infringers and is a clear expression of public policy approving such action. Language in Mercoid as to such action being "contrary to public policy" is therefore inapplicable under present law. Several recent cases and articles have interpreted Section 271 which we cite in the margin.[10]

In the instant case we are dealing with a direct infringement action. The defense of misuse has been raised.

*Leasing Policy*

The trial court, in Findings of Fact 46 and 47, held that the product of Stearns is the Stearns Electronic Holiday Detector which consists of the following component parts:

(a) The electrode-pusher-carriage combination covered by the Stearns patent, hereinafter referred to as the Patented Apparatus.

(b) Electrical high voltage generating and signaling apparatus,

hereinafter referred to as the Electrical Apparatus.

The Court also held that the Electrical Apparatus is not a patented part of the Stearns patent and that such apparatus represents the major portion of the cost of Stearns' Electronic Holiday Detector. Other Findings of Fact on this phase of the case are as follows:

"Finding No. 51. The D. E. Stearns Co. follows an exclusive exploitation policy as follows:

"(a) It will lease but refuses to sell the Stearns Holiday Detector.

"(b) It refuses to sell or lease components of the Stearns Electronic Holiday Detector.

"(c) It will not make the Patented Apparatus available except in conjunction with and tied to the Electrical Apparatus.

"(d) It requires users to lease the apparatus as a whole."

Finding 52 states that the "Electrical Apparatus" is a separable, divisable part of Stearns' detector and that the "Patented Apparatus" need not be employed with the "Electrical Apparatus" of the Stearns detector but may be used with electrical apparatus of other types.

Finding 53 states that if the "Patented Apparatus" were made available with or without the "Electrical Apparatus," according to the customer's desire, "it would be feasible to employ electrical apparatus of competitors with the 'Patented Apparatus' of Stearns."

Finding 54 states that the "actual realistic effect upon competition of the tie-in policy of the D. E. Stearns Co. is to require persons who desire to obtain separable Patented Apparatus to take and pay for the unpatented Electrical Apparatus as well."

10. Dr. Salsbury's Laboratories v. I. D. Russell Co. Laboratories, 8 Cir., 212 F.2d 414; Sola Electric Co. v. General Electric Company, D.C., 146 F.Supp. 625; Electric Pipe Line v. Fluid Systems, 2 Cir., 231 F.2d 370. See also the following Law Review Articles: 66 Harvard Law Review 909; 54 Michigan Law Review 199; 23 George Washington Law Review 36; 21 George Washington Law Review 521. See also 28 Journal of the Patent Office Society 427.

Finding 55 states that the effect of such policy is to restrain competition in the unpatented Electrical Apparatus and components thereof.

We note first that the trial court made no mention of Section 271 of the 1952 Patent Act. This may have been due to the fact that the invention of Stearns does not include the Electrical Apparatus and thus a person selling such Electrical Apparatus probably would not be a contributory infringer. But we need not decide the effect of Section 271 on the record before us.

■ Stearns argues that there was no evidence to support a finding or conclusion that Stearns "refuses" to make available its electrode, pusher and carriage except as a complete holiday detector. From a reading of the record it is obvious that the trial court based its finding of misuse, partially at least, on the testimony of Dick E. Stearns, which we cite in the margin.[11] It is true that Dick E. Stearns did not specifically state that D. E. Stearns Company "refuses" to make available its electrode, pusher and carriage, except as a complete holiday detector. But we hold that on the basis of Stearns' testimony, the alleged existence of a market for the patented parts, the fact that the patented parts represented only 10% of the cost of the complete detector, and the admitted policy of Stearns of not selling the patented articles alone, the trial court properly could draw a reasonable inference that the practices followed by D. E. Stearns Company were being employed to expand the scope of the patent monopoly and restrain competition. If Stearns had been asked the precise question, "Do you 'refuse' to sell or operate on any other basis?" there would not be any problem. But, based on the record before us, we cannot say that the findings of misuse as to the leasing agreement are clearly erroneous.

■ We further find without merit the argument made by appellant that it is necessary for appellee to show that a device was *sold* with an agreement to take other material. Section 3 of the Clayton Act[12] specifically includes the *leasing* of goods and a violation of that section is made out when the lease is shown to have been made "on the condition, agreement, or understanding that the lessee * * * shall not use or deal in the goods, wares, merchandise, * * * of a competitor * * * of the lessor." Here the lease requires the taking of both patented and unpatented parts, which of necessity has the actual realistic effect of restricting competition in the unpatented parts. One who already has a complete holiday detector is not likely to be interested in obtaining an additional unit of the non-patented electrical apparatus. Hunter Douglas Corp. v. Lando Products, Inc., 9 Cir., 1954, 215 F.2d 372 and Leo J. Meyberg Co. v. Eureka Williams Corporation, 9 Cir., 1954, 215 F.2d 100 are inapposite, since in both cases no sales were shown to have been made. But, as we have heretofore said, the Clayton Act by its very terms is not limited to sales.

11. "Q. Mr. Stearns, does the D. E. Stearns Company follow the policy of leasing holiday detectors? A. Yes, sir.

"Q. You do not sell holiday detectors, is that correct? A. Not in the United States.

"Q. Not in the United States? A. No.

"Q. Mr. Stearns, does the D. E. Stearns Company sell or lease any parts of holiday detectors? A. No, sir.

"Q. They do not? A. Except as replacement parts. If the damage to a machine is beyond the scope of ordinary wear and tear, a charge is made for repairs.

"Q. In other words, I cannot come to you and obtain parts unless I am a lessee of a Stearns holiday detector, is that correct? A. Well, you don't get—the lessee of Stearns detectors doesn't get parts, they get machines repaired for them and then they are charged for the repairs, if the breakage which necessitates that repair is beyond the scope of ordinary wear and tear.

"Q. You do not supply parts except as replacements for parts of Stearns holiday detectors, is that correct? A. That's correct."

12. 15 U.S.C.A. § 14.

Appellant also cites the recent cases of Electric Pipe Line, Inc. v. Fluid Systems, Inc., 2 Cir., 1956, 231 F.2d 370, 371 and Great Lake Equipment Co. v. Fluid Systems, Inc., 6 Cir., 1954, 217 F.2d 613, in which it was held that an owner of a combination patent who designed the installation and guarantees performance of the patented system could properly insist that unpatented components of the patented system be obtained from the patent owner. The component parts were "especially modified or designed for use with the" patented system, which, as argued in the later case, might bring Section 271(d) of 35 U.S.C.A. into play. But in the instant case, the facts are clearly dissimilar to those found in the Fluid Systems cases, and the cases are therefore inapposite. Vulcan Mfg. Co. v. Maytag Co., 8 Cir., 1934, 73 F.2d 136, is of no assistance since the case was decided prior to the development of later Supreme Court interpretations of the misuse and contributory infringement doctrine.

The mere fact that an owner of a patented article combines the article with an unpatented article and sells or leases the unit as a whole does not *per se* prove misuse. The holder of a patent can exploit his legally protected monopoly in the patent as best he sees fit, so long as in doing so he does not restrain competition in the unpatented article. Probably the best way for an owner of such a patent to protect himself from a charge of misuse would be to offer or stand ready to offer the patented item alone.[13]

*Licensing Policy*

The D. E. Stearns Company grants two forms of license. One form of license (Defendant's Exhibit AA) permits the licensee "to make or have made and to sell but not to use or lease" the patented electrode-pusher combination upon the payment of $250.00 for each combination. The other form of license (Defendant's Exhibit BB) permits the licensee "the non-exclusive right and license to make

or to have made and to use or lease but not to sell" the patented combination, upon the payment of $250.00 for each combination. The District Court held Tinker & Rasor's pusher and electrode combination sells for about $22.50 and that the net effect of D. E. Stearns & Company requiring a royalty is to require licensees to adopt and adhere to the same policy as Stearns, "namely, offering patented apparatus only in conjunction with and tied to unpatented electrical apparatus, thereby restraining competition in unpatented components of holiday detectors." We fail to see anything illegal in the forms of license granted by Stearns. Tinker & Rasor admitted at the trial that if their detector had included the patented apparatus of Stearns that, based on their rentals, the $250.00 royalty would be recouped within a month. We also note that the $250.00 royalty is for the life of the patent (some eight years remaining at the time of trial). It was also brought out at the trial that a licensee, under the Stearns patent, could also use various other sizes of electrodes and pusher contactors which could be secured from any other source.

The net effect of Stearns' licensing policy is to collect only *one* royalty for the grant of a license for the life of the patent. While a licensee under the Stearns' license is required to pay one royalty of $250, the fact that the licensee can then attach the patented item to his own electrical apparatus, may very well be the determining factor in the success of the licensee in leasing or selling his own holiday detector as the case may be.

Stearns owns a patent on a particular device and is legally allowed to charge for the grant of a license an amount that will allow it to realize the reward to which, as the owner of the patent, it is entitled. In United States v. General Electric Co., 272 U.S. 476, 489, 47 S.Ct. 192, 196, 71 L.Ed. 362, it is said

---

13. If 35 U.S.C.A. § 271 is applicable, perhaps the owner need not even offer or stand ready to sell the unpatented article. This would be where the unpatented part

is a non-staple material part of the invention, which is not capable of substantial non-infringing uses.

"Conveying less than title to the patent or part of it, the patentee may grant a license to make, use, and vend articles under the specifications of his patent *for any royalty*, or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure." (Emphasis supplied.)

█ In the instant case the license agreements do not contain any price fixing agreements or any other judicially decreed objectionable provisions. To say that the mere amount of money due and payable for the grant of a license is subject to judicial review would render each and every agreement made subject to court approval. No cases have gone that far. The finding of misuse by the trial court as to the licensing agreements standing alone is clearly erroneous. However, it couples with the policy of leasing and to sales in such a way as to more effectively require one who desires to use the patented article to pay a premium on the unpatented part of the complete apparatus as though the whole apparatus was patented.

## Damages

The District Court, after the conclusion of the trial, dismissed Tinker & Rasor's counterclaim for damages on the ground that Tinker & Rasor had not proved damage to their business or property as the proximate result of the misuse of the Stearns patent. Tinker & Rasor, in their cross-appeal, contend that they proved the *fact* of damage and that it was error for the trial court to refuse to order an accounting to determine the *amount* of damage.

█ Under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, a person claiming damages must show that he has been "injured in his business or property by reason of anything forbidden in the antitrust laws." This Court, in a well-reasoned opinion, recently summarized the cases in this field and made the following statement:

"We take it that the controlling rule today in seeking damages for loss of profits in antitrust cases is that the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue. Once that has been accomplished, the jury will be permitted to 'make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.' Bigelow v. RKO Pictures, Inc., supra, 327 U.S. 251 at page 264, 66 S.Ct. 574, 90 L.Ed. 652. The cases have drawn a distinction between the quantum of proof necessary to show the *fact* as distinguished from the *amount* of damage; the burden as to the former is the more stringent one. In other words, the fact of injury must first be shown before the jury is allowed to estimate the amount of damage." Flintkote Company v. Lysfjord, 9 Cir., 1957, 246 F.2d 368, 392.

The *only* evidence as to the *fact* of damage which was before the trial court consisted of the following:

(1) The admission of Stearns that it only sold and leased complete holiday detectors consisting of patentable and unpatentable items.

(2) The $250.00 royalty charged by Stearns of its licensees under either one of two forms of license.

(3) The statement of John P. Rasor that Tinker & Rasor "sells any and all of their parts for holiday detectors" and that the sale of parts constitutes a substantial part of the business of Tinker & Rasor.

(4) The statement of John P. Rasor that he was not "aware of" the sale by Tinker & Rasor of any parts for use in conjunction with the Stearns detector.

(5) The self-serving statement of John P. Rasor that Tinker & Rasor "could supply a battery, an electrode, possibly a ground wire" for use with the Stearns detector.

(6) The statement of John P. Rasor that for the year 1951 (last calendar year before the trial) the sale of parts by Tinker & Rasor constituted about "10 or 12 or 15 per cent" of their total business.

Triangle Conduit & Cable Co. v. National Electric Products Corporation, 3 Cir., 1945, 152 F.2d 398, also involved a situation wherein it was alleged that plaintiff was excluded from a "potential market." It was therein pointed out that there can be an antitrust violation by defendant with no injury to plaintiff by reason thereof.[14] It was also noted in the case that it is necessary in a suit for treble damages under the Clayton Act to state facts showing an intention and preparedness to engage in business. While in the instant case, Tinker & Rasor were in the parts business as to their own devices, there was no evidence presented which indicated that Tinker & Rasor tried to sell parts to customers of Stearns or that they intended to promote the sale of parts to customers of Stearns. John P. Rasor only testified that Tinker & Rasor, "could supply" certain items. By this was meant Tinker & Rasor's items could be *used* in Stearns' detectors. There was likewise no evidence presented which indicated that Tinker & Rasor were prepared and equipped to supply parts for Stearns' detectors. Nor was there any direct proof or even allegation made that Tinker & Rasor did or did not sell parts for Stearns' detectors.

■ After carefully reviewing the record, it is evident that the finding of *fact* by the trial court that Tinker & Rasor did not prove the *fact* of damage is not clearly erroneous.

### Costs on Appeal

■ Tinker & Rasor also argue in their cross-appeal that the trial court should not have awarded costs to Stearns for their first appeal to this Court, and that because Tinker & Rasor won the case on retrial or hearing, there should have been an apportionment of the costs of the first appeal, especially in view of the fact that the record on the second appeal was to a great extent composed of the same physical record used on the first appeal. Tinker & Rasor argue that since they were "gracious enough to join in a time-saving, money saving, labor saving stipulation" that the printed record from the first appeal be used in this second appeal, that it is unjust for them to pay the total cost of the record in the first appeal. We note that without the stipulation by both parties, Tinker & Rasor could have been taxed with the cost of two records of the first appeal had Stearns been unwilling to stipulate to using the same record and had Stearns completely won the instant appeal. We have examined the cases cited by the parties and find no error in the action of the trial court in awarding Stearns costs on the first appeal. See Broffe v. Horton, 2 Cir., 173 F.2d 765; Seely v. Hunt, 5 Cir., 109 F.2d 595; City of Orlando v. Murphy, 5 Cir., 94 F.2d 426, and Rule 25 of the United States Court of Appeals for the Ninth Circuit, 28 U.S.C.A.

We affirm the trial court in its findings as to (1) misuse of the patent by virtue of Stearns' leasing and selling of a complete detector; (2) non-equivalency of Claim 7 of Stearns' detector with Tinker & Rasor's detector; (3) dismissal of Tinker & Rasor's counterclaim for damages; and (4) awarding of costs to Stearns of the first appeal.

We reverse all other findings and conclusions relating to validity of the patent, file wrapper estoppel, misuse through Stearns' licensing agreements, disclaimer and indefiniteness.

Costs of the present appeals are to be divided equally between the parties in view of the fact that both parties have appealed.

14. See also the dissenting opinion of Justice Frankfurter in Bigelow v. RKO Radio Pictures, 327 U.S. 251, 267, 66 S. Ct. 574, 581, 90 L.Ed. 652, wherein it is stated "legal injury is not automatically established by proof of a restraint of trade in violation of the Sherman Law. See Keogh v. Chicago & Northwestern R. Co., 260 U.S. 156, 162, 163, 43 S.Ct. 47, 49, 50, 67 L.Ed. 183."

FIG.15.

FIG.1.

FIG.7.

FIG.10.

EXHIBIT C

D. E. STEARNS

INSULATION TESTING DEVICE

Filed Aug 23, 1941

2,332,182

EXHIBIT D
DEFENDANTS' HOLIDAY DETECTOR